# REPORTS OF CASES

DETERMINED IN

# THE SUPREME COURT,

## JULY TERM, 1879.

---

[No. 5535.]

## JOSEPH S. FRIEDMAN *v.* EDWARD NELSON, LELAND STANFORD, C. P. HUNTINGTON, AND MARK HOPKINS.

TITLE TO THE SOUTH BEACH AND WATER PROPERTY OF SAN FRANCISCO.—
The deed of May 24th, 1851, from the Commissioners of the Sinking Fund to the Commissioners of the Funded ·Debt of San Francisco, transferred to the latter the title to the tide-land on Mission Bay, vested in the City of San Francisco by the Act of March 26th, 1851.—[REPORTER.]

SAME—DEFECTIVE CONVEYANCE CURED BY LEGISLATION.—A conveyance of the city's interest in tide-lands by a majority of the Commissioners of the Funded Debt, and held to be ineffectual by the decision in *Leonard* v. *Darlington,* 6 Cal. 123, for the reason that two of the five Commissioners did not sign the deed, is cured by the Act of April 14th, 1857, ratifying and confirming such conveyance.—[REPORTER.]

CONSTRUCTION OF DEED.—Where a deed granted "*all* that beach and water property lying between Folsom Street on the north, Ship's Channel on the east, the city limits on the south, and Price Street on the west, *and* known on the said map as. blocks numbers one (1) to thirty-two (32) inclusive": *held,* that a block of "beach and water property" lying within the exterior boundaries was included, notwithstanding it was numbered thirty-three (33) on the map referred to in the deed.—[REPORTER.]

APPEAL from the District Court of the Third Judicial District, San Francisco.

The action was ejectment for two one hundred-vara lots, in block thirty-three of the South Beach and Water property in San Francisco. The land is in Mission Bay, and between high and low water mark. The title was originally in the State, by virtue of its sovereignty, but in 1850 the City of San Francisco claimed title to it as part of its public lands. · In the latter part of the year 1850, the city, attempting to provide for the payment of its indebtedness, appointed certain persons, designated Commissioners of the Sinking Fund, to act as agents in selling the property and applying the proceeds to the payment of its indebtedness. In December, 1850, the city made a conveyance of all its interest in the property to those Commissioners. In 1851—March 26th—the Legislature passed an act (Stats. 1851, p. 307) giving to the city "the use and occupation" of the property for ninety years. This act included all the tidelands within the city limits. May 1st, 1851, the "Act to authorize the Funding of the Floating Debt of the City of San Francisco, and to provide for the payment of the same," became a law. (Stats. 1851, p. 387.) It appointed five persons as "Commissioners of the Funded Debt of San Francisco," and gave them power, among other things, to lease or sell the property of the city which might be conveyed to them for that purpose. May 24th, 1851, the Commissioners of the Sinking Fund conveyed the South Beach and Water property to them. The descriptive words of the deed are: "All that beach and water property lying between Folsom Street on the north, Ship's Channel on the east, the city limits on the south, and Price Street on the west, and known on the said map as blocks numbers one (1) to thirty-two (32) inclusive." Subsequently, September 17th, 1852, three of the Commissioners of the Funded Debt, as "the present acting members of the Board," deeded the two lots in controversy to George Gordon, the plaintiff's grantor. In April, 1856, the Supreme Court, in the case of *Leonard* v. *Darlington*, 6 Cal. 123, held that such conveyances were ineffectual to pass the legal title, for the reason that all five of the Commissioners did not unite in the conveyance. The Legislature, at the next session thereafter, passed the curative Act of April 14th, 1857, (Stats. 1857, p. 200) confirming "all

sales at auction, made *bona fide* by three or more of the Commissioners of the Funded Debt of the City of San Francisco before the 1st day of January, 1854." The act further provided that all such sales "are hereby legalized and made as good, effectual, and binding as though the same had been legally executed by the full Board of Commissioners, and signed by each member thereof."

Kelsey Hazen sued the city in April, 1855, for seven thousand dollars, and obtained judgment, Dec. 15th, 1860, for eleven thousand eight hundred and seventy dollars and thirty-three cents. Execution on the judgment issued against the city, and under it the interest of the city in the two lots in controversy was sold for twenty dollars to Isaac N. Thorne, who received a deed therefor January 12th, 1864. The defendants deraign title from Thorne under that deed. Upon the trial below, it was shown that block thirty-three is within the exterior limits of the description in the deed from the Commissioners of the Sinking Fund of May 24th, 1851. Judgment was rendered in favor of the plaintiff, and the defendants moved for a new trial. The motion was granted, and the plaintiff appealed.

*Robinson, Olney & Byrne,* for Appellant.

The legal title to the premises in controversy is in the plaintiff, if the land is included in the deed from the Commissioners of the Sinking Fund to the Commissioners of the Funded Debt. It was proven that the land is beach and water property, and is within the exterior boundaries described in the deed of May 24th, 1851. But upon an inspection of the map referred to in the deed, it appears that the water property within those boundaries was divided into thirty-three blocks instead of thirty-two, and the lots in controversy are a part of block thirty-three. If the description in the deed had stopped with the words " on the west," there would be no doubt that the property was included. The question, then, is : Does the clause " and known on the map as blocks numbers one (1) to thirty-two (32) inclusive," which is merely an addition to an already complete description, limit the conveyance to thirty-two blocks ? The question

is not a doubtful one, if a long series of uniform decisions can be relied upon as settling the law.

The first rule of construction is to carry out the intention of the parties, if possible. Considering all the circumstances, is it not evident that the omission of block thirty-three in the last clause was accidental, and that it was the intention to convey all the beach and water property? The scrivener evidently made a mistake in the number of blocks, writing "two" instead of "three," or perhaps he read the figures on the map wrong. To make such a mistake was extremely easy; hence, another rule of construction comes in, and that is, to follow that description in a deed which is least liable to mistake. Here, all the water property between certain streets and boundaries is conveyed. There is no chance for mistake in the description. Another cardinal rule of construction is, that where a description is given, and then another description by way of reiteration or affirmation is added, the first shall be followed, and the last rejected so far as inconsistent with the first. (*Haley* v. *Amestoy*, 44 Cal. 132; *Piper* v. *True*, 36 Cal. 606; *Dodge* v. *Walley*, 22 Cal. 228; *Wade* v. *Deray*, 50 Cal. 376; *Wilcoxson* v. *Sprague*, 51 Cal. 642; *Stanley* v. *Green*, 12 Cal. 148; *Thatcher* v. *Howland*, 2 Met. 41; *Worthington* v. *Hylyer*, 4 Mass. 195; *Pike* v. *Monroe*, 36 Me. 309; *Jackson* v. *Clark*, 7 Johns. 223; *Melvin* v. *Proprietors*, etc., 5 Met. 15, and cases cited; *Drew* v. *Drew*, 28 N. H. 489, and cases cited; *Stevens* v. *Johnson*, 55 N. H. 405; *Hibbard* v. *Hurlbut*, 10 Vt. 173; *Doe & Smith* v. *Galloway*, 5 B. & Ad. 43; *Good Title* v. *Southern*, 1 Maule & S. 299; *Lodge's Lessee* v. *Lee*, 6 Cranch, 237; *Parker* v. *Kane*, 22 How. 1; *Howell* v. *Saule*, 5 Mason, 410; *Custer* v. *Tafts*, 3 Pick. 272; *Willard* v. *Moulton*, 4 Me. 14; *Mayo* v. *Blount*, 1 Ired. 283; *Moore* v. *Griffin*, 22 Me. 350; *Field* v. *Huston*, 21 Me. 69; *Chesley* v. *Holmes*, 40 Me. 536; *Jackson* v. *Barringer*, 15 Johns. 471; *Hathaway* v. *Power*, 6 Hill, 453; 4 Cruise Dig. 269, 270; Greenl. Note 1.)

Another rule of construction well established is, that "where the principal description purports to be of all or the whole of any property described, any additional description, apparently designed to apply to the same property, but which proves to be

only partially true, will not be construed to restrict the grant to a portion of the property, but all will pass." (*Drew* v. *Drew*, 28 N. H. 489, and cases cited; *Stevens* v. *Johnson*, 55 N. H. 405. See, also, same cases cited above.) Again, "if there is an explicit and unambiguous grant of a thing, any exception or reservation which is manifestly contradictory will be rejected." (*Rutherford* v. *Tracy*, 48 Mo. 328, and cases cited above.) "If there be two descriptions of the land conveyed which do not coincide, the grantee is entitled to hold that which is most beneficial to him." (*Melvin* v. *Proprietors, etc.* 5 Met. 15; *Esty* v. *Baker*, 50 Maine, 325; 4 Cruise Dig. 244; Greenl. Ed. notes 2 and 3; *Doe* v. *Galloway*, 5 Barn. & Adol. 43.) When other rules fail to enable us to ascertain the description of the property, the construction put upon the deed by the parties may be considered. The Commissioners of the Funded Debt and the city construed the deed to include the block. When other rules fail to enable us to ascertain the description of the property, the construction put upon it by the parties may be considered. The Commissioners of the Funded Debt and the city construed the deed to include block thirty-three, as will be seen from their action in regard to the land. The Legislature confirmed all sales made *bona fide*, and of course this was included.

The sale of this land, made in good faith and for full value, has been confirmed by a special act of the Legislature. The land was sold for money with which to pay the city's debts, and it is a part of the history of this State that the city's debts were paid with the proceeds of those sales by the Funded Debt Commissioners. The Legislature had the power to confirm the sales and pass the title, and did so. The statute has been in force twenty-six years, and its constitutionality has not been attacked in all that time. (*Board of Education* v. *Fowler*, 19 Cal. 11; *San Francisco* v. *Canavan*, 43 Cal. 556; *Ellis* v. *The Commissioners of the Funded Debt of the City of San Francisco*, 38 Cal. 629.)

If a legalizing act does not make a defective deed good by relation from the time of its execution, how can a grantee, from the grantee in the defective conveyance, intermediate between its defective execution and the legalizing act, be held to have

title after the curative act? This Court has held, in the case of defective applications for public lands, that the curative act made the application good from the beginning. (*Copp* v. *Harrington*, 47 Cal. 236; *Rooker* v. *Johnston*, 49 Cal. 3.)

*S. W. Holliday, amicus curiæ*, also for the Appellant.

Plaintiff's title has the sanction of each and every branch of the public authorities—the ordinances, the statutes, the conveyance, the payment of full value at a public sale more than a quarter of a century ago, which has ever since stood unquestioned by the public authorities. The purchase price went to pay the city debt and to establish the public credit. Are our laws so uncertain and infirm, that a title which the city and State both have endeavored to make good and valid, pursuant to a public sale for full value, shall fail on an objection raised by a stranger to the title—an objection so purely technical and without merit?

*S. M. Wilson*, for the Respondent.

The land in controversy here is all in block thirty-three, and therefore not embraced in the description which limits the conveyance to block thirty-two. The map referred to is an essential part of the deed. (*Caldwell* v. *Center*, 30 Cal. 543; *Vance* v. *Force*, 24 Ibid. 444.) Examining that map we find that "blocks numbers one to thirty-two" constitute but a small part of the exterior boundaries. They not only do not cover any of the uplands, (or but a small part of them) but they leave out as much water property as would equal about ten blocks — simply being within the exterior boundaries is not enough. There is another test—the property must be beach and water property. Looking at the map, however, we find that part of the beach and water property is not laid out into lots and blocks or numbered. Now, does the description embrace all that property? · If not, it is because the last grand criterion is the numbers, and by that test block thirty-three is excluded.

The description is precisely the same as if it were transposed,

and read thus: "Also, all that beach and water property known on the said map as blocks numbers one (1) to thirty-two (32) inclusive, and lying between Folsom Street on the north, Ship's Channel on the east, the city limits on the south, and Price Street on the west." We have thus not one word more or less than is used in the deed, and a mere transposition always is admissible in the construction of written instruments. If we are not correct in this, then the entire sentence, "and known on the said map as blocks numbers one (1) to thirty-two (32) inclusive," must be and virtually is stricken out of the deed; for it would read without it the same as with it. This is in violation of one of the cardinal rules of construction. Where there are two constructions, one of which gives every word some effect and force, and another construction by which words cease to have any force, the first is always deemed the correct one. (See, also, Civil Code, sec. 1641.)

Besides, as before observed, if this deed be good for block thirty-three, it is good for the spaces not numbered, equal to about ten blocks, and moreover it would convey all the streets, one of which—Channel Street—is over a hundred feet wide. That the numbers must control, and not the boundaries, becomes also clear from an examination of the very next description in the deed, after the description in question, for there we find distinctly conveyed by numbers a large number of one hundred-vara lots, which lie within the very boundaries that affect the lands described in the complaint. Take as a notable instance the lot one hundred and forty-five, on the northwestern corner of First and Brannan Streets. The greater part of it is water property. If it were already embraced in the seventh description, why specify it in the eighth? If not embraced in the seventh, by what reasoning can block thirty-three be held to be embraced in the seventh? The same is true of lots one hundred and fifty-one on King Street, and one hundred and seventy-one on Brannan Street, and three hundred and twenty-one on Townsend Street, all being mostly water property.

We, therefore, confidently submit, that to fall within the seventh description in the deed, the lots must be, first, within the boundaries named; second, must be beach and water lots; and

third, numbered from one to thirty-two; and that as block thirty-three was not within the numbered lots, it is not embraced in these conveyances.

The deed was absolutely void. The power granted to the five commissioners could not be executed by three. Therefore, the deed was not " duly made by the Commissioners of the Funded Debt of the City of San Francisco." (*Leonard* v. *Darlington*, 6 Cal. 125; *Welch* v. *Sullivan*, 8 Ibid. 165; *Sample* v. *Lamb's Curator*, 2 La. 275; 1 Sug. on Powers, 143–146.) The case of *Leonard* v. *Darlington*, 6 Cal. 125, was decided first at the January Term, 1856, and again affirmed, on rehearing, at the April Term, 1859, and was made on a deed precisely like the one at bar. In consequence of the decision of *Leonard* v. *Darlington*, the Act of April 14th, 1857, (Stats. 1857, p. 200) was passed. It was an attempt to legalize those void deeds. The object was to make those deeds " as good, effectual, and binding as though the same had been legally executed by a full Board of Commissioners, and signed by each member thereof." Here those deeds were treated by the Legislature as the Court had treated them—as not " legally executed," which is a mere equivalent phrase for " duly executed." But that act was entirely beyond the power of the Legislature. The city was owner, and the Legislature could not divest the title, nor make that deed good which was before void absolutely. (*Grogan* v. *San Francisco*, 18 Cal. 590; *Pimental* v. *San Francisco*, 21 Cal. 357; *Satterlee* v. *San Francisco*, 23 Cal. 318; *San Francisco* v. *Canavan*, 42 Cal. 557; *Herzo* v. *San Francisco*, 33 Cal. 135.)

By the COURT:

We are of opinion: 1. That the deed from the Commissioners of the Sinking Fund to the Commissioners of the Funded Debt transferred to the latter the title vested in the City of San Francisco by the Act of 1851.

2. That the deed made by the Commissioners of the Funded Debt to George Gordon, having been ratified and confirmed by the Act of April 14th, 1857, operated to transfer the title to Gordon.

3. That each of these several conveyances include the premises in controversy.

Order granting a new trial reversed and cause remanded. Remittitur forthwith.